IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA   )
   )
v.   )     CRIMINAL CASE NO.
   )     1:18-CR-00004-MHC
DEMETRIUS RUSHIN,   )
   )
     Defendant.   )

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This case is before the Court on Defendant Demetrius Rushin's ("Defendant") Motion to Suppress and Supplemental Motion to Suppress. (Docs. 18, 27). Having considered Defendant's motions and all supporting documents submitted, and for the reasons set forth below, this Court **RECOMMENDS** that Defendant's Motions to Suppress be **DENIED**. (Docs. 18, 27).

## DEFENDANT'S MOTIONS TO SUPPRESS

On January 3, 2018, the Grand Jury indicted Defendant in connection with an armed robbery of a postal worker in Clarkston, Georgia, on October 3, 2013, in violation of 18 U.S.C. §§ 2114(a) and 2. (Doc. 1). Defendant contends in his Motions to Suppress that statements he made to postal inspectors should be suppressed because they were made as a result of government agents' coercion and were therefore in violation of his Fifth Amendment right against self-incrimination. (Doc. 27).

## I.   **FACTUAL BACKGROUND**

On October 3, 2013, an armed robbery took place at the Clarkston, Georgia, Post Office. (Tr. of May 3, 2018 Evidentiary Hrg., Doc. 26, hereinafter "Tr.," 4). On the night of the robbery, a postal employee driving a truck arrived at the Clarkston Post Office to pick up the daily remittance (cash received from the sale of money orders, etc.). (Tr. 4). Two individuals came toward the dock and robbed the driver of $50,000 to $60,000 and fled. (Tr. 4). No arrests were made that night. (Tr. 4). Postal Inspector Jeffrey Adkins testified that he participated in an interview of subjects on the night of the robbery. (Tr. 5). Defendant Rushin was one of the subjects interviewed. (Tr. 5). Defendant was considered a person of interest because he was present in the parking lot when the robbery occurred; his girlfriend, Kennsha Heart Wilcox worked at the Clarkston Post Office; Wilcox was the person who walked the remittance bag of money out to the driver; and an agent ran Defendant's criminal history which revealed that he had almost forty (40) arrests at the time. (Tr. 5).

After the robbery, federal agents spoke to the supervisor of the Clarkston Post Office and asked whether there was anyone employed there that "may or may not have any issues." (Tr. 5). The supervisor said Wilcox, who was pregnant, and Defendant had just been evicted and were in "financial need." (Tr. 5). Defendant and Wilcox were both interviewed about the October 3, 2013 robbery. (Tr. 5-6). During his interview, Defendant stated that he and his girlfriend, Wilcox, shared one vehicle and on the night of the robbery he was sitting in the car waiting to pick her up. (Tr. 7). While waiting

for Wilcox, Defendant told Inspector Adkins that he saw a couple of individuals flee and get into a white SUV. (Tr. 7). Defendant also told Inspector Adkins that he had no personal involvement in the robbery. (Tr. 7). No one was arrested for the October 3, 2013 armed robbery, and the case eventually grew cold. (Tr. 6).

In 2014, Defendant was again interviewed by postal inspectors after an armed robbery took place at the Conley Post Office. (Tr. 6). Agents did not believe the 2013 Clarkston Post Office robbery was connected to the 2014 Conley Post Office robbery but interviewed Defendant to (1) be thorough, and (2) ensure that his story about the 2013 Clarkston Post Office robbery had not changed. (Tr. 6).

On January 3, 2017, another attempted armed robbery took place at the Clarkston Post Office. (Tr. 7). The style of the attempted armed robbery was very similar to that of the armed robbery that occurred in 2013. (Tr. 7). Some time prior to the January 2017 attempted armed robbery of the Clarkston Post Office, Inspector Adkins learned from two different sources that Wilcox allegedly planned the 2013 Clarkston Post Office armed robbery, that Defendant served as the lookout during the robbery, and that two other individuals actually conducted the armed robbery. (Tr. 8, 29). Inspector Adkins subsequently learned Wilcox no longer worked at the Clarkston Post Office and that she had resigned because she had been caught stealing. (Tr. 8). With this similarity between the 2013 armed robbery and the 2017 Clarkston attempted robbery in mind, Inspector Adkins decided to speak with Wilcox. (Tr. 8).

On Wednesday, January 18, 2017, Inspector Adkins, along with a female agent,

3

met with Wilcox at her job after work. (Tr. 8). Wilcox agreed to speak with the agents and gave an audio recorded statement implicating Defendant. (Tr. 8). Although Wilcox told the agents that she had nothing to do with the 2013 Clarkston robbery, Wilcox also stated that shortly after the robbery occurred, she learned that Defendant had planned the robbery, was the lookout, and had recruited a friend who conducted the robbery. (Tr. 8-9). Further, Wilcox told the postal inspectors that she did not come forward with that information because she did not want anyone to believe that she was a part of the 2013 armed robbery. (Tr. 9). Inspector Adkins informed Wilcox that he planned to interview Defendant, and then asked Wilcox if she and the Defendant were still together, and whether she would see him that night. (Tr. 9). Wilcox responded, "yes," and Inspector Adkins asked Wilcox if she was going to tell Defendant that she gave him up or that she told Inspector Adkins that he (Rushin) did it (committed the 2013 armed robbery). (Tr. 9). Upon learning that Wilcox and Defendant were still together, Inspector Adkins asked Wilcox if she was in fear of her safety (considering the information she had just given him about Defendant). (Tr. 9). Wilcox responded, "absolutely not." (Tr. 9). Wilcox told Inspector Adkins that she was going to tell the Defendant herself, then Inspector Adkins asked Wilcox "will he give a statement?" (Tr. 9). Wilcox responded, "yeah, he'll come in and say - - tell the truth that he did it, and I had nothing to do with it." (Tr. 9-10).

The next day, on January 19, 2017, Inspector Adkins called Wilcox to make sure that she was not in any danger. (Tr. 10). After Wilcox was adamant that Defendant

4

absolutely was not violent with her and assured Inspector Adkins that she felt safe, Adkins asked Wilcox whether she told the Defendant that she gave a statement, and Wilcox responded, "Yes, I did." (Tr. 10). Inspector Adkins then asked Wilcox whether Defendant was going to give a statement, and she said, "Yes, he will." (Tr. 10). Because Defendant did not have a phone, contacting Wilcox was the only way Inspector Adkins could learn whether Defendant was willing to give a statement. (Tr. 10). Wilcox told Inspector Adkins that he could not talk with Defendant that day because Defendant's work schedule for the day required him to take several MARTA buses to work, and Defendant did not want to miss work. (Tr. 10). Wilcox also told Inspector Adkins to come to their (Defendant and Wilcox's) home the next day, Friday morning, and Defendant would give a statement then. (Tr. 10).

The next morning, on January 20, 2017, Inspector Adkins, along with Inspector Williams, another postal inspector, went to the Wilcox/Rushin residence in Decatur and knocked on the door. (Tr. 11). When Defendant came to the door, Inspector Adkins asked Defendant whether he wanted to talk inside or outside of the house. (Tr. 11). Defendant agreed to speak to the agents and said that he wanted to talk outside because he did not want others in the house to hear. (Tr. 11). Defendant and Inspector Adkins then walked to Inspector Williams' Ford Explorer to talk. (Tr. 11). Inspector Adkins asked Defendant whether he was familiar with the fact that he [Inspector Adkins] had spoken with Wilcox two nights ago, and with what she said, and Defendant said, "Yes." (Tr. 11). Inspector Adkins asked Defendant whether he was going to give a statement,

5

and Defendant said, "Yes." (Tr. 11). Defendant then asked what was going to happen to Wilcox, and what was going to happen to him. (Tr. 11). Inspector Adkins explained by outlining the case and informing Defendant that he had someone who said Wilcox planned it (the October 3, 2013 armed robbery of the Clarkston Post Office), that Defendant was the lookout, and that Defendant had recruited the two robbers who conducted the robbery. (Tr. 12). Inspector Adkins also informed Defendant that another person called and said that she heard a phone call between Defendant and Wilcox; that Wilcox knew something about it (the robbery); that Wilcox gave Defendant some of the information; that Defendant was the lookout; and that Defendant had recruited an individual to help him. (Tr. 12). The caller did not know who Defendant recruited to help him but knew that the person who helped him was in the Fulton County Jail. (Tr. 12).

After outlining the details about the status of the investigation, Inspector Adkins further explained to Defendant:

> If people are saying [Wilcox] did it, but she absolutely says 'I had nothing to do with [it]' and you say absolutely she had nothing to do with it, I don't know that she could be convicted, and my understanding is if she can't be convicted, then a prosecutor is not going to issue charges, but . . . ultimately it's not my decision, but I don't think she would be charged if, in fact, you and she are saying she absolutely had nothing to do with it.

(Tr. 14). Inspector Adkins credibly testified that he did not tell Defendant that Wilcox would be indicted and arrested if Defendant did not cooperate and give him a statement. (Tr. 27). Defendant then asked what would happen to him. (Tr. 14). Inspector Adkins

6

told Defendant that he could not tell him exactly, but he believed Defendant would "be charged and arrested at some point." (Tr. 14). When Defendant asked what kind of sentence he would get, Inspector Adkins credibly testified that he told Defendant that there are different factors that determine sentencing and he had absolutely "no knowledge of" what kind of sentence Defendant would receive. (Tr. 14). After his questions were answered, Defendant told Inspector Adkins to "let [him] sleep on it [and] talk to Ms. Wilcox." (Tr. 14-15). Defendant told Inspector Adkins to come back the next day, and Inspector Adkins said, "Okay." (Tr. 15). Defendant went back inside the house and Inspector Adkins went back to work. (Tr. 15). Inspector Adkins credibly testified that he was truthful and did not exaggerate the status of his investigation as it related to Wilcox or Defendant. (Tr. 13). Inspector Adkins also credibly testified that it is not his practice to misstate or exaggerate evidence, and he did not do so with Defendant. (Tr. 13). After leaving Defendant's house, Inspector Adkins received additional information from a source about Wilcox's involvement in the 2013 armed robbery of the Clarkston Post Office. (Tr. 24-26). Inspector Adkins testified, however, that this additional information still did not establish probable cause to affect an arrest on Wilcox. (Tr. 26).

The next day, during a rainy Saturday on January 21, 2017, Inspector Adkins called Wilcox again because Defendant did not have a phone.[1] (Tr. 15). After Inspector

_____

[1] To the extent that Defendant infers that Inspector Adkins called Wilcox a number of times in an effort to persuade or coerce Defendant into giving a statement, the record does not support that inference. Instead, both Wilcox and Defendant

7

Adkins asked whether Defendant would give a statement, Wilcox responded, "Yes, he's going to give a statement." (Tr. 15). Wilcox then handed the phone to Defendant. (Tr. 15). Defendant assured Inspector Adkins that he would give a statement. (Tr. 15). Inspectors Adkins and Williams then traveled across town to Defendant's residence. (Tr. 15). Inspector Adkins testified that because it was his day off, he would have been wearing pants, a shirt, his gun, his duty belt, badge, and a pair of handcuffs. (Tr. 17). Upon arriving, Inspector Adkins asked whether Defendant wanted to talk in the house or in Inspector Williams' Ford Explorer. (Tr. 16). Defendant stated he wanted to talk in the Ford Explorer. (Tr. 16). Thereafter, while Inspector Williams was seated in the front seat of the Ford Explorer, Defendant and Inspector Adkins sat in the back seat of the vehicle, and Inspector Adkins began recording Defendant's statement. (Tr. 16).

Seconds into Defendant's recorded statement, Inspector Adkins asked Defendant whether he was in the Ford Explorer "freely and voluntarily," and Defendant responded, "Yeah." (Gov't Ex. 1-A; Gov't Ex. 1-B, at 1). Immediately afterwards, Inspector Adkins informed Defendant that he was not under arrest and read Defendant his Miranda rights. (Gov't Ex. 1-A; Gov't Ex. 1-B, at 1). Defendant knew he was not under arrest and would not be under arrest at any point on January 21, 2017. (Gov't Ex. 1-A; Gov't Ex. 1-B, at 1). Inspector Adkins asked Defendant what was his highest level of education, and Defendant told him the eleventh grade. (Gov't Ex. 1-A;

---

indicated that Defendant did not have a phone and Wilcox was the only way Inspector Adkins could confirm whether Defendant was still going to give a statement. (Gov't Gov't Ex. 1-A; Gov't Ex. 1-B, at 2; Tr. 10).

Gov't's Ex. 1-B, at 2). Inspector Adkins also asked Defendant whether he had a problem understanding anything Inspector Adkins was saying, and Defendant indicated that he did not. (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 2). Inspector Adkins then said, "Okay, if you don't understand something at any point, tell me to stop . . . please. Again, at any point [if] you want to stop the interview, [or] you wanna leave, that's fine." (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 2). Inspector Adkins made it clear that he was investigating the 2013 Clarkston Post Office armed robbery and wanted "to get a truthful statement from [Defendant] about what [his] role [was]; who was involved as well as who wasn't involved in that robbery." (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 2). Defendant initially stated that Wilcox did not have any involvement in the robbery, proceeded to answer Inspector Adkins' questions, and then further described his role as the lookout in the 2013 Clarkston Post Office armed robbery. (See generally Gov't's Ex. 1-A; Gov't's Ex. 1-B). Other than not wanting to help Inspector Adkins find the additional robber(s), Inspector Adkins testified that Defendant did not express any concerns during their conversation. (Tr. 19). The interview lasted approximately twenty minutes, and Defendant was cooperative throughout the interview. (Gov't's Ex. 1-A; Gov't's Ex. 1-B; Tr. 18).

## II.   LEGAL ANALYSIS

Defendant contends that statements he made to Inspectors Adkins and Williams on January 21, 2017, should be suppressed because they were compelled as a result of the agents' coercive techniques. In support, Defendant contends that the agents

9

threatened to arrest or prosecute someone dear to him. Specifically, Defendant argues that, because the agents had no probable cause against Wilcox, any threat to arrest and/or prosecute her should be regarded as unduly coercive. In response, the Government contends that based on the totality of the circumstances, Defendant's statement on January 21, 2017, was voluntary and is therefore admissible. The Government further argues that any statements agents made concerning Wilcox were not threats but rather truths about her status in the agents' investigation.

The Fifth Amendment to the United States Constitution prohibits the use of an involuntary confession against a defendant in a criminal trial. U.S. Const. amend V; Dickerson v. United States, 530 U.S. 428, 434-35 (2000); United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005). In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that the Government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. It is well-settled, however, that "[p]re-custodial questioning does not require Miranda warnings." United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (citing United States v. Brown, 441 F.3d 1330, 1347-49 (11th Cir. 2006)).

In this case, it is undisputed that Defendant was not in custody when he was

10

advised of and waived his Miranda rights.  Indeed, Defendant does not argue he was in custody, or arrested, or otherwise restrained.  Miranda warnings were not required because Defendant was not in custody, was not arrested, and his freedom of movement was restrained to the degree associated with a formal arrest.  Brown, 441 F.3d at 1347 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983); see also Stansbury v. California, 511 U.S. 318, 321 (1994) (noting that an office's obligation to administer Miranda warnings does not attach until "'there has been such a restriction on a person's freedom as to render him 'in custody'") (citation omitted); Street, 472 F.3d at 1309. Although Miranda warnings were not required, Defendant agreed to waive his Miranda rights anyway while seated next to Inspector Adkins in the back seat of Inspector Williams' vehicle.  (Gov't Ex. 1-B; Tr. 17-18).  Regardless of whether Miranda warnings were required, "the court must still rule on the confession's voluntariness." Jarrell v. Balkcom, 735 F.2d 1242, 1252 (11th Cir. 1984).  The focus of the voluntariness inquiry is "on whether the defendant was coerced by the government into making the statement: 'The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" United States v. Mendoza-Cecilia, 963 F.2d 1467, 1475 (11th Cir. 1992) (quoting Colorado v. Connelly, 479 U.S. 157, 170 (1986)).  "The district court must consider the totality of the circumstances in assessing whether police conduct was 'causally related' to the confession." Id. (quoting Miller v. Dugger, 838 F.2d 1530, 1536 (11th Cir. 1988)).  "Sufficiently coercive conduct normally involves subjecting the

11

accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." Id. Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment. Id. at 175. "Absent police conduct causally related to the confession, there is . . . no basis for concluding that any state actor has deprived a criminal defendant of due process of law." Connelly, 479 U.S. at 164. The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) (citing Lego v. Twomey, 404 U.S. 477, 489 (1972)).

Applying the law to the facts in this case, this Court concludes that under the totality of the circumstances, the postal inspectors did not coerce, scare, trick, or threaten Defendant into making a statement on January 21, 2017. Instead, Defendant knowingly and voluntarily made an informed choice of his own free will to provide an exculpatory statement for Wilcox and an inculpatory statement against himself. Although Defendant argues the waiver of his Fifth Amendment rights was tainted because the postal inspectors "obliquely" coerced him by threatening to prosecute Wilcox, his girlfriend, the record does not support Defendant's argument. There is nothing in the record indicating that the postal inspectors made any threats to prosecute Wilcox to either the Defendant or to Wilcox. Thus, Defendant's reliance on a number of cases reciting the general principle that a threat to prosecute a third party is coercive and renders a confession involuntary when probable cause does not exist to believe that

12

the third party committed a crime at the time the threat was made, is misplaced. See Lynuum v. Illinois, 372 U.S. 528, 534 (1963) (suppressing confession and deeming the police tactics improper where officers informed a defendant that her failure to cooperate would result in her losing financial aid for, and custody of, her children.); Rogers v. Richmond, 365 U.S. 534 (1961) (suppressing confession where police officers misled the defendant into thinking they were about to arrest his ailing wife for a shooting even though the evidence suggested that defendant's subsequent confession was likely truthful.); Thompson v. Haley, 255 F.3d 1244, 1247-48 (11th Cir. 2001) (holding that "whether a threat to prosecute a third party was coercive depends upon whether the state had probable cause to believe that the third party had committed a crime at the time the threat was made."); Martin v. Kemp, 760 F.2d 1244, 1248 (11th Cir. 1985) (affirming the governing legal principle that where a defendant claims that his guilty plea is involuntary because he was prompted by police threats to prosecute a third party, the defendant bears the "heavy burden" of showing that at the time the threats were made, the police did not have probable cause to believe that the third party had committed a crime.).

In contrast to those cases, this case does not present the egregious circumstances present in cases where the Supreme Court and the Eleventh Circuit have found suppression of the evidence was necessary to deter wrongful government conduct. Here, both Wilcox and Defendant voluntarily provided statements to the postal inspectors in the absence of any improper threats, coercion, or inducement. Therefore,

13

the fact that the postal inspectors did not have probable cause to arrest Wilcox when Defendant was interviewed and gave a statement is not probative here.

Indeed, the record reveals that a few days prior to Defendant agreeing to give a audio recorded statement to Inspector Adkins, Wilcox voluntarily provided her own audio recorded statement. (Tr. 8). While Wilcox denied any advanced knowledge of, or involvement in, the 2013 armed robbery of the Clarkston Post Office, there was no evidence presented that Wilcox was coerced or threatened with prosecution or arrest when she voluntarily described Defendant's role in planning, participating, and recruiting robbers in the 2013 robbery.[2] (Tr. 9). Even when Wilcox explained that her reason for not having come forward was because "she thought" law enforcement would think she was a part of the 2013 armed robbery, there is nothing in the record indicating that the postal inspectors threatened to arrest her.

Furthermore, the facts show Inspector Adkins did not have to coerce Defendant into waiving his <u>Miranda</u> rights or threaten to arrest or prosecute Wilcox. Instead, it appears that Defendant and Wilcox agreed amongst themselves that Defendant would provide a statement exonerating Wilcox and admitting his involvement in the 2013 armed robbery. When Wilcox was informed that there were individuals alleging that she was involved in the 2013 armed robbery, the evidence shows that it was Wilcox who voluntarily told Inspector Adkins that Defendant would give him a statement indicating

---

[2] The Court notes that Wilcox was not called as a witness during the evidentiary hearing.

that she had nothing to do with the 2013 robbery. Specifically, when Inspector Adkins informed Wilcox that he planned to talk to Defendant and asked whether she was going to tell Defendant that she gave him up, Wilcox told Adkins that she was going to tell the Defendant about the statement herself. (Tr. 9). When Inspector Adkins asked Wilcox if Defendant would give a statement, Wilcox voluntarily stated, "he will tell you the truth that he did it, and that I had nothing to do with it." (Tr. 10). Inspector Adkins did not threaten to tell Defendant that Wilcox "gave him up" or threaten to arrest or prosecution her if Defendant did not provide a statement.

The next day, Inspector Adkins called Wilcox to make sure she was safe and had not placed herself in danger by telling Defendant that she provided a statement to the postal inspectors. (Tr. 10). After Wilcox was adamant that Defendant was not violent with her and that she felt safe, Inspector Adkins asked Wilcox if she told Defendant that she provided a statement, and she said, "Yes." (Tr. 10). Inspector Adkins then followed-up on their conversation from the previous day and asked Wilcox if Defendant was going to give a statement, and Wilcox said, "Yes." (Tr. 10). Wilcox suggested that the postal inspectors meet with Defendant the next day because Defendant had to work and she did not want the interview to interfere with Defendant's employment and bus schedule that day. (Tr. 10).

The next day, January 20, 2017, when Inspector Adkins met with Defendant, the record reveals Defendant was not coerced or threatened with the arrest of Wilcox if he did not provide a statement. Instead, when Inspector Adkins knocked on Defendant and

15

Wilcox's door, Defendant came outside because he did not want anyone in the house to hear the conversation. (Tr. 11). When Defendant was asked whether he was going to provide a statement, it was Defendant who asked what would happen to Wilcox and what would happen to him. (Tr. 11-12). Inspector Adkins responded by outlining the case and then providing details of the information he received from two different sources implicating Defendant and Wilcox in the 2013 armed robbery of the Clarkston Post Office. (Tr. 12). Specifically, Inspector Adkins explained that he had one person who said Wilcox planned the 2013 robbery and provided Defendant with information; that he sat as the lookout; and he recruited the robbers. (Tr. 12). Inspector Adkins also informed Defendant that another person told him that she overheard a phone call between Wilcox and Defendant, and that Wilcox knew something about it (the robbery); that Wilcox gave Defendant some of the information; that Defendant was the lookout; and that Defendant had recruited an individual to commit the robbery, who was in the Fulton County Jail. (Tr. 12). Inspector Adkins also revealed to Defendant that when he spoke to Wilcox and told her about the information he received concerning their involvement in the 2013 armed robbery of the Clarkston Post Office, Wilcox said it was not true and that she had nothing to do with it whatsoever. (Tr. 13). Inspector Adkins told Defendant that Wilcox said that rather than volunteering information to Defendant, he had asked her questions and elicited, extracted, or gleaned information from her. (Tr. 14). In response to Defendant's question, Inspector Adkins explained that, "If your truthful statement is that [Wilcox] had nothing to do with it, then I don't know that she

16

could be charged." (Tr. 14).  By way of further explanation, Inspector Adkins stated:

> If people are saying [Wilcox] did it, but she absolutely says 'I had nothing to do with [it]' and you say absolutely she had nothing to do with it, I don't know that she could be convicted, and my understanding is if she can't be convicted, then a prosecutor is not going to issue charges, but . . . ultimately it's not my decision, but I don't think she would be charged if, in fact, you and she are saying she absolutely had nothing to do with it.

(Tr. 14).  Inspector Adkins credibly testified that he did not tell Defendant that Wilcox would be indicted and arrested if Defendant did not cooperate by giving him a statement.  (Tr. 27).  Defendant then asked what would happen to him.  (Tr. 14).  Inspector Adkins told Defendant that he could not tell him exactly, but that Adkins believed he (Defendant) would "be charged and arrested at some point."  (Tr. 14).  When Defendant asked what kind of sentence he would get, Inspector Adkins credibly testified that he told Defendant that he did not know what kind of sentence Defendant would receive.  (Tr. 14).  After his questions were answered, Defendant told Inspector Adkins to "let [him] sleep on it [and] talk to Ms. Wilcox."  (Tr. 14-15).  Thus, the contexts of the statements reveal that they were not threats of any sort.  Instead, the record demonstrates that in response to Defendant's question regarding would happen to Wilcox, Inspector Adkins truthfully explained her predicament.  Inspector Adkins also truthfully described information he received alleging Wilcox's culpability in the 2013 robbery.  Thus, Inspector Adkins' responses were not threats but truths that appear to be permissible since it merely constitutes an attempt to both accurately depict the

17

AO 72A
(Rev.8/82)

situation to the Defendant and, perhaps to elicit more information about Wilcox's culpability, if any. See, e.g., United States v. Hufstetler, 782 F.3d 19, 24-25 (1st Cir. 2015) (rejecting claim of coercion based on threat to arrest defendant's girlfriend and stating "an officer's truthful description of a family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about a family member's culpability").

Similarly, on January 21, 2017, when Inspector Adkins called Wilcox to ask if Defendant was going to provide a statement, she affirmed that Defendant was going to give a statement, and passed the phone to him. (Tr. 15). Defendant then also affirmed that he was going to give a statement to the postal inspectors. (Tr 15). There were no threats of anyone being prosecuted or arrested if Defendant did not speak with Inspector Adkins. Thereafter, Inspectors Adkins and Williams traveled to Defendant's residence, Defendant came outside and sat in the back seat of Inspector Williams' vehicle next to Inspector Adkins. (Tr. 16, 21-22). There, Defendant, who was not in handcuffs, was informed that he was not under arrest; was asked if he understood that he would not be arrested that day; was told that he was free to leave at any time and could get out of the car and go back inside his residence; and was asked if he was there freely and voluntarily. (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 1). Defendant responded in the affirmative, he was given his Miranda warnings, and he voluntarily waived his Miranda rights. (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 1). Inspector Adkins told Defendant that he was investigating the Clarkston Post Office armed robbery from October 2013, that

18

his goal was to get a truthful statement from Defendant about what his role was; who was involved as well as who was not involved in the robbery. (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 1). Inspector Adkins asked Defendant to tell him what happened that night in his own words and to be please be truthful. (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 1). Defendant responded that he had seen some things and repeated it to someone he knew. Without prompting or being asked, Defendant added "And ah Kennesha (Wilcox) didn't know nothing about it, she ain't know I was thinking that or if I had done thought it, or talk to somebody about it or anything. She ain't know nothing of the sort." (Gov't's Ex. 1-A; Gov't's Ex. 1-B, at 1). Again, it was Defendant who mentioned Wilcox before stating she had nothing to do with it. While the Court does not doubt that Defendant was genuinely concerned for Wilcox's welfare, that concern is not enough to render his statement involuntary.

In context, it is difficult to view Inspector Adkins' actions, in their totality, as improper. Neither the testimony nor the recording reflects any promise that Wilcox's fate would turn on whether Defendant cooperated. To the contrary, Inspector Adkins' response to Defendant's statements detailing the information he received from two different sources during the course of his investigation implicating Wilcox (his girlfriend and the mother of his child) may have been undoubtedly difficult for Defendant to digest, and Inspector Adkins may have been aware that Defendant was in a rough spot. But, Inspector Adkins never lied, exaggerated the situation, or conditioned either Defendant or Wilcox's arrest on Defendant providing a statement or otherwise

AO 72A
(Rev.8/82)

"inculpat[ing] himself or watch[ing] his significant other go to jail in his place," as Defendant now argues.

Furthermore, this Court is not convinced that Inspector Adkins' coerced Defendant when he explained that "if people are saying [Wilcox] did it, but she says she had nothing to do with it, and you say she had nothing to do with it, I don't know that she could be convicted, and my understanding is if she can't be convicted, then a prosecutor is not going to issue charges, but ultimately its not my decision, but I don't think she be charged if you and she are saying she absolutely had nothing to do with it." Inspector Adkins' explanation in this regard does not constitute an impermissible promise and was, in fact, less of a threat and more of an accurate statement concerning the situation.  Given the absence of impermissible threats or promises or any other improper conduct by the postal inspectors, there is little, if any, other evidence in the record to warrant suppression -the length and nature of the questioning was relatively brief (twenty minutes) and limited in scope; Defendant does not allege that he was deprived of food, sleep, or bathroom breaks; and there is nothing about his personal background presented to the Court that would suggest that he was particularly susceptible to coercion or to having his will overborne.  Therefore, considering the entirety of the surrounding circumstances, and the lack of a suggestion of any coercion beyond Inspector Adkins' responses to Defendant providing details of his investigations and revealing sources implicating both Defendant and Wilcox, and Inspector Adkins' explanation of Wilcox's predicament that fairly described the situation confronting

Defendant and Wilcox, this Court cannot can discern any coercion, threats, or promises that would render Defendant's confession involuntary. Indeed, Defendant's desire to mitigate the impact of what may be his criminal activity on his girlfriend is not the same as external pressure intentionally created by law enforcement seeking to guarantee cooperation or elicit a confession. As such, Defendant is not entitled to suppression of the inculpatory statement at issue.

## CONCLUSION

For the reasons set forth above, this Court **RECOMMENDS** that Defendant's Motions to Suppress be **DENIED**. (Docs. 18, 27). As there are no further motions pending, the undersigned certifies this case ready for trial. The Clerk is directed to terminate the reference to the undersigned.

**SO ORDERED, REPORTED AND RECOMMENDED** this ___6___ day of September, 2018.

/S/LINDA T. WALKER
_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

21